# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3340-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.J.,

    Defendant-Appellant,

and

D.P.,

    Defendant.

_____

IN THE MATTER OF H.P.,
a minor.

_____

Submitted October 12, 2023 – Decided December 12, 2023

Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FN-08-0117-21.

Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, Designated Counsel, on the brief).

PER CURIAM

Defendant A.J.[1] (Althea) appeals from the October 13, 2021 order finding she abused and neglected her daughter H.P. (Hazel) under N.J.S.A. 9:6-8.21(c)(4)(b). Because the court did not make particularized findings that Althea's actions were grossly negligent or posed a substantial risk of harm to Hazel to support its conclusion of abuse and neglect, we vacate the order and remand to the trial court to make the required statutory findings.

---

[1] We use initials and fictitious names to protect the parties' privacy. R. 1:38-3(d)(12).

Hazel, born in March 2021, is the daughter of Althea and defendant D.P. (Derrick).[2]  The Division of Child Protection and Permanency (the Division) first became involved with Althea in 2019 when concerns arose regarding her older son, Z.S. (Zander).  At that time, Althea was admitted into a rehabilitation facility to treat her substance abuse issues.  Zander's father obtained full custody of Zander; at the time of the hearing in this matter, Althea had supervised visitation with Zander once a week.

While pregnant with Hazel, Althea tested positive for opiates in August 2020 and positive for fentanyl following a hair follicle test in January 2021, "but it was not segmented."[3]  After Hazel was born prematurely in March 2021, Althea tested positive for prescribed methadone.  Hazel also tested "positive for methadone but did not experience withdrawal."

---

[2]  As there were no findings of abuse and neglect against Derrick, he is not a party to this appeal.

[3]  According to the laboratory that processed the hair follicle test, hair specimens taken from the head "can be segmented by 0.5 inch or 1.5 inch sections to show approximate usage trends over time."  The average person's hair grows approximately 0.5 inch per month; a 1.5 inch segment would show roughly three months of usage history.

During the Division's visit to the hospital following Hazel's birth, Althea told caseworkers "she had been substance free for over a year . . . and that she had taken an old prescription for tooth pain while she was pregnant" that accounted for the positive opiate test result.

On April 9, 2021, Althea was involved in a motor vehicle accident while Hazel was in the car. She reported she was struck in the rear of her car and pushed forward into the car ahead of her. Law enforcement contacted the Division, informing it that Althea "appeared to be intoxicated and was arrested and charged with" driving while intoxicated (DWI), N.J.S.A. 39:4-50. The officers stated Hazel was "properly secured in her car seat." Neither Althea nor Hazel were injured. Althea was not at fault for the accident.

Later that night, Division caseworkers spoke with Althea and Derrick at their home. Althea reported that she was on her way home from shopping when she was involved in a minor car accident. She stated that when the police arrived, they "thought that she was on something and she . . . shared with them that she was prescribed [m]ethadone and she had her dose that" morning. Althea reported the officers conducted a field sobriety test, which she passed, but the officers were convinced Althea was under the influence. Althea said she

"refused the breathalyzer" and drug test because "she felt like the officers were harassing her."

The Division workers also spoke with Derrick. He stated that when Althea left the home that day, he thought she was going to a urine screen[4] and then to the grocery store. Derrick stated Althea called him later to tell him she was in a car accident. Althea's sister was going to meet her at the scene of the accident.

Derrick stated Althea did not appear to be under the influence before leaving the home nor when he saw her later. He did not think she was using any illegal substances.

The caseworkers also spoke with Althea's sister, Alice, who reported she was concerned that Althea was under the influence because she was "nodding off" after being in the accident and "being very difficult" with the police officers both at the scene and later at the police station. Alice said Althea locked herself in the bathroom after the accident where she tried to "cleanse" her system because she knew the Division would require her to complete a urine screen.

The Division implemented a Safety Protection Plan establishing Derrick as Althea's supervisor while with Hazel. However, a new plan was needed after

---

[4] The Division caseworker testified there was no urine screen scheduled for that day.

5

Derrick returned to work several days later. The Division could not find another supervisor and they had concerns with Derrick because of the contradictory information he provided regarding Althea and Alice's statements. Thereafter, the Division conducted a removal of Hazel on April 12, 2021. The child was placed with Althea's mother, and different relatives cared for her during the day while the grandmother was at work. Althea's mother supervised visitation between Althea and Hazel.

Although Althea initially resisted submitting to a hair follicle and drug screening, she later agreed to undergo the testing. A caseworker later learned that Althea did not appear on video chat with the Center for Family Services (CFS) for her substance abuse assessment scheduled for April 9, 2021. The CFS worker said she called Althea, "but her phone kept going to voicemail." However, later that day, Althea contacted the CFS worker, stating "her phone was shut off and she had to go pay the bill." The CFS worker "found it very concerning that [Althea]'s phone was shut off conveniently around the time of her substance abuse evaluation."

On April 13, 2021, Althea and Derrick completed hair follicle tests and Derrick underwent a random urine screening. His test results were negative. Althea's urine screen on April 12 was diluted and tested positive for her

A-3340-21

prescribed methadone. Althea's hair follicle results, which assessed the last ninety days, were positive for fentanyl, norfentanyl, and methadone.

On April 21, 2021, the Division received a phone call from Althea's methadone clinic, informing it that Althea had "consented to releasing information but did not want her screening results and progress shared with [the Division]." The clinic worker could not opine as to Althea's progress because treatment had only started on April 1, but the worker stated Althea "ha[d] a long road ahead of her because she [wa]s actively trying to hide information from [the Division]." The clinic worker disclosed that Althea was prescribed one hundred milligrams of "methadone five days weekly," and was not permitted to take home vials of the medication. She was also participating in one individual counseling session per month and three group sessions per month.

Based on all of the denoted information, the Division substantiated the allegations of abuse and neglect of Hazel by Althea. The Division found Hazel was only three weeks old on the day Althea was charged with DWI. The child was "hysterically crying" after the accident and "needed [Althea's] full attention. [Althea] was nodding off while attempting to feed [Hazel] and was unable to tend to [Hazel's] needs properly due to being under the influence of what was

7

suspected to be illicit substances."  The Division further found that Hazel's "safety require[d] a separation of the child from" Althea.

## II.

On October 12, 2021, the court conducted a fact-finding hearing during which Officer John Freitag of the Washington Township Police Department testified.  Freitag responded to the motor vehicle accident involving Althea at approximately 4:30 p.m.  As he spoke with Althea, Freitag noted "her speech was slow and slurred," and "[h]er eyes appeared glassy and bloodshot."  The officer asked if she had taken any medication, and Althea responded she was prescribed and had taken methadone at 9:00 that morning.

Freitag saw Hazel in the backseat in a rear-facing child seat and requested Althea contact a family member to come and take the baby.  He stated Hazel was crying and he asked Althea if the baby was hungry and whether she should feed her.  He noticed that while Althea was feeding the baby, "[Althea] was nodding off with her head down and chin in her chest," and her hand holding the bottle was "limp," so Hazel was unable to drink the liquid in the bottle.  Freitag woke Althea up and told her to properly adjust the bottle.

Due to his observations, Freitag decided to conduct field sobriety tests, to determine whether Althea was under the influence.  According to Freitag, during

A-3340-21

the "walk-and-turn" test, Althea "moved her right foot . . . in front of her left foot twice . . . which is an indicator"; and "stumbled to her right," then "stumbled to her left" several times. While performing the "one-leg-stand" test, Althea "swayed from side-to-side and waved her arms to aid her balance." She stumbled and continued to sway throughout the test.

Freitag stated he charged Althea with DWI, refusal to submit a breath sample, N.J.S.A. 39:4-50.4a, and other motor vehicle summonses and then arrested her because he "was confident that she was under the influence and unable to operate a motor vehicle safely." Althea was transported to the police station where she refused to undergo a breathalyzer test.

The Division caseworker also testified, describing her interactions with Althea on the day of the accident and thereafter and the results of the drug testing. Althea's counsel did not object to the admission of the hair follicle results into evidence but objected to the court's consideration of the test results because they spanned ninety days prior to taking the test, which was before the motor vehicle accident and before Hazel was born. Counsel argued the court could not consider the testing as evidence that Althea "was under the influence at the time of the accident." The court agreed and declined to consider the positive hair follicle test in its "overall decision" because it showed "that she did

9

have [substances] in her system but whether or not it was on that particular day at the time of the accident" was unknown.

On October 13, 2021, the judge issued an oral decision concluding Althea was under the influence at the time of the accident and finding the Division had proved abuse and neglect under N.J.S.A. 9:6-8.21(c)(4). The judge "f[ou]nd Officer Freitag to be a credible witness" because "[Freitag] made good eye contact throughout his examination" and "answered all questions both on direct and on cross-examination without equivocation." The judge stated Freitag "was in command of his recollection as to what occurred on th[e day of the accident]." The judge also found the Division caseworker "answered all of the questions on direct and on cross-examination with[out] equivocation" and "made good eye contact and . . . was in command of the facts as they were purported in her testimony as well as her report."

The judge concluded "[Althea] was the sole caretaker of [Hazel] who was . . . in the vehicle at the time of the accident." Relying on Freitag's testimony regarding his observations and the field sobriety tests, and the officer's conclusion that Althea was under the influence at the time of the accident, the judge found Althea abused and neglected Hazel.

On appeal, Althea contends: the judge did not make any particularized findings that she was grossly negligent; this court should not defer to the judge's factual findings regarding the field sobriety tests or his credibility determination regarding Freitag; and the Division did not prove Althea posed a substantial risk of harm to Hazel. The Division and the Law Guardian dispute these arguments and request this court affirm the order.

We defer to the family court's factual findings "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Deference is accorded because of the family courts' "specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012).

However, our review of the determination that Althea abused or neglected Hazel under Title Nine is de novo. N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 177 (2014) (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012)).

A.

We begin in addressing Althea's contention that the trial court did not explain how her behavior amounted to gross negligence, as required for a statutory finding of abuse and neglect. Althea asserts the evidence did not demonstrate she overmedicated on her prescribed methadone treatment, and under New Jersey case law, the use of prescribed medication alone cannot establish abuse and neglect under N.J.S.A. 9:6-8.21(c)(4)(b).

"Title [Nine] controls the adjudication of abuse and neglect cases." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). It was enacted "to protect children 'from acts or conditions which threaten their welfare.'" G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 176 (1999) (quoting State v. Demarest, 252 N.J. Super. 323, 330 (App. Div. 1991)). An abused or neglected child is defined under the statute as

> a child whose physical, mental, or emotional condition has been impaired . . . as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

"[U]nder Title [Nine], whether the [parent or] guardian intended to harm the child is irrelevant. If a parent or guardian commits an intentional act that has unintended consequences," the statute applies. G.S., 157 N.J. at 176. Our Supreme Court has found "that N.J.S.A. 9:6-8.21(c)(4) can apply to some accidentally-caused injuries." Id. at 177.

The G.S. Court interpreted the phrase "failure to exercise a minimum degree of care," under N.J.S.A. 9:6-8.21(c)(4)(b), to mean that the parent or guardian has committed "conduct that is grossly or wantonly negligent, but not necessarily intentional," which is conduct that is "done with the knowledge that injury is likely to, or probably will, result." Id. at 178 (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). In other words, "a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. Wanton or willful conduct may also consist of "actions taken with reckless disregard for the consequences." Id. at 178. In sum, the Court reasoned that if the action is committed intentionally, "whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant." Ibid.

The Court instructed the Division and courts to examine the harm to the child and whether the parent or guardian could have avoided that harm by acting "to remedy the situation or remove the danger." Id. at 182. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Ibid. This standard, the Court reasoned, "allows the State to intervene to protect children without unduly infringing on parents['] rights to raise and discipline their children." Id. at 180.

Following its decision in G.S., the Court has acknowledged that "the question of whether a particular event is to be classified as merely negligent, grossly negligent, or reckless can be a difficult one." Dep't of Child. & Fams., v. T.B., 207 N.J. 294, 309 (2011). The determination "is quite frequently 'fact sensitive.'" N.J. Div. of Youth & Fam. Servs. v. A.R., 419 N.J. Super. 538, 544 (App. Div. 2011) (quoting N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011)). In T.B., the Court clarified that "every failure to perform a cautionary act is not abuse or neglect. When the failure to perform a cautionary act is merely negligent, it does not trigger section (c)(4)(b) of the abuse or neglect statute." 207 N.J. at 306-07. "[W]here a parent is merely negligent there is no warrant to infer that the child will be at future risk." Id. at 307.

We are further guided by the Court's decision in Y.N., 220 N.J. at 169. There, the defendant learned she was four months pregnant on a visit to the hospital for an unrelated injury. Ibid. She told hospital staff she was taking Percocet prescribed for pain following injuries she sustained in a car accident. Ibid. The defendant was instructed not to suddenly stop taking Percocet as the withdrawal could risk her pregnancy. Ibid. She enrolled in a methadone maintenance treatment program. Id. at 169-70. When the defendant gave birth, the child showed withdrawal symptoms from methadone. Id. at 170.

After an incident of domestic violence between the defendant and the child's father, the police informed the Division. Id. at 171. Several weeks later, the child's father reported to the Division that the defendant was "high on drugs." Ibid. The defendant was told she had to submit to a random urine sample. Ibid. When the defendant left before the test was completed, the facility categorized the failure to undergo the test "the equivalent of a positive test result." Ibid.

The Division thereafter filed a complaint for the custody, care, and supervision of the child and alleged abuse and neglect. Ibid. The following day, the defendant passed a drug test, and the court granted her custody of the child. Id. at 172. At the abuse and neglect hearing, the court found the Division had established abuse and neglect. Ibid. This court affirmed, "solely on the basis

that [the defendant] caused her child to suffer withdrawal symptoms from the methadone she took as part of a prescribed, bona fide medical treatment plan." Id. at 168.

The Supreme Court reversed. Id. at 186. The Court "reject[ed] the Appellate Division's conclusion that '[w]here there is evidence of actual impairment, it is immaterial whether the drugs taken were from a legal or illicit source.'" Id. at 184 (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. Y.N., 431 N.J. Super. 74, 82 (App. Div. 2013)), rev'd, 220 N.J. 165 (2014). The Court reasoned that the Appellate Division's decision would have "create[d] a perverse disincentive for a pregnant woman to seek medical help and enter a bona fide detoxification treatment program that w[ould] address her and her baby's health needs." Ibid. The Court found that the greater potential harm to the child would be the defendant deciding not to seek proper prenatal treatment, and not "timely entering a medically approved detoxification program that w[ould] improve the outcome for her newborn." Ibid.

The Court recognized the effectiveness of methadone treatment according to the Centers for Disease Control and Prevention, and that the United States Department of Health and Human Services has concluded that "methadone maintenance treatment can save the life of a baby born to an addicted mother

and that a newborn experiencing methadone withdrawal is far better off than a newborn addicted to heroin." Id. at 184-85. We have since described the defendant's actions as a "prudent, medically sound course of action." N.J. Div. of Child Prot. & Permanency v. K.M., 444 N.J. Super. 325, 333 (App. Div. 2016).

It is clear from Y.N. that the use of prescribed medication without evidence of other illegal use cannot sustain a finding of abuse or neglect under Title Nine. Here, the trial court did not find the use of methadone constituted abuse and neglect. Rather, the court found Althea was impaired and under the influence while she was driving with Hazel, and that impairment established abuse and neglect. The court's decision was grounded solely on Freitag's observations of Althea following the accident.

The court did not make particularized findings, and did not classify the incident as merely negligent, grossly negligent, or reckless as required under T.B. There was no evidence Hazel was harmed. There was no indication whether Althea's use of methadone earlier that day caused the fatigue, slurred speech or glassy eyes observed by Freitag or whether Althea was aware of the effects the methadone had on her.

Because the court did not make any findings as to Althea's culpability, if any, we cannot properly review the abuse and neglect finding. There was no suggestion in the court's opinion as to whether Althea was merely negligent, grossly negligent, or reckless. As we have stated, if a defendant "ingested only a prescribed amount of [a medication] and it [was] found that she abused no other substances in connection therewith, the legal standard contained in the statute, as described in T.B., would preclude a finding of abuse or neglect." N.J. Div. of Youth & Fam. Servs. v. S.N.W., 428 N.J. Super. 247, 258 (App. Div. 2012).

Here, there was no evidence elicited at the fact-finding hearing that Althea's impairment at the time of the accident was the result of any other substance other than her prescribed methadone. The April 12, 2021 urine sample only showed positive results for methadone, and the April 13, 2021 hair follicle test did not reveal any admissible positive results to demonstrate Althea was under the influence of any other substances at the time of the accident.

If the trial court based its finding of abuse and neglect on facts other than Althea appeared intoxicated because she was taking prescribed methadone, it must articulate those particularized findings. Without those findings, it was improper for the court to support its decision solely on Freitag's perception and

18

conclusion that Althea was impaired by her prescribed methadone. There was no evidence, one way or another, that Althea exceeded her prescribed dosage of methadone. Nor was there evidence that she was not permitted to drive while taking the prescribed amount of methadone. To the contrary, Althea could only obtain the methadone at the clinic, and she drove herself there for the treatment. In addition, Hazel was properly secured in her car seat and Althea was not at fault for the accident. To find abuse and neglect, the court had to make more specific findings and a determination of Althea's culpability for her condition. As we stated in S.N.W., "[t]he Division was required to prove that defendant's condition, as described by the judge in his findings, was produced by a grossly negligent or reckless act." 428 N.J. at 257.

We are constrained to vacate the order and remand for the court to make those factual findings. These facts might include whether Althea "ingested only a prescribed amount of [methadone]" and whether "she abused no other substances in connection therewith," to provide the basis for whether that amounted to gross negligence or recklessness and whether that prohibited Althea from exercising the minimum degree of care. See id. at 258.

B.

We briefly address Althea's argument regarding the judge's consideration of Freitag's testimony, specifically that the judge erred in accepting Freitag's opinion regarding Althea's performance on the field sobriety tests.

As stated, we defer to the trial court's factual findings and credibility determinations when supported by credible evidence, Cesare, 154 N.J. at 411-12, "unless the trial court's findings 'went so wide of the mark that a mistake must have been made.'" N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). We discern no reason to disturb the trial judge's findings regarding Freitag. The court observed Freitag, had the opportunity to assess his demeanor and testimony and found the officer credible. Based on Freitag's training and experience, the court found Freitag was credible in his description of Althea's performance on the sobriety tests.

In addition, defense counsel did not object to any procedural aspect of the hearing or to the court permitting Freitag to review his report to refresh his recollection. A review of the record reveals no plain error. R. 2:10-2. The court properly permitted Freitag to refresh his recollection using his report. Thus, the

trial court's factual findings regarding the field sobriety tests were supported by substantial credible evidence in the record.

Vacated and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3340-21